IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 26, 2021 Session

## KIMBER KEPLINGER BASTONE v. JAMES MICHAEL BASTONE

**Appeal from the Circuit Court for Hamilton County**
**No. 13D114                John B. Bennett, Judge**

_____

### No. E2020-00711-COA-R3-CV[1]

_____

This is a consolidated appeal from judgments entered upon two post-divorce petitions filed by the mother, seeking to modify the parties' permanent parenting plan to require the father to pay an upward deviation in child support to fund private school tuition at Baylor School in Chattanooga ("Baylor"), first for the parties' eldest of three children in one petition and then for the parties' middle child in the second petition. The father filed an answer objecting to the expense of Baylor tuition given the parties' respective financial situations. He also filed a counter-petition alleging that the mother had violated the joint decision-making provision in the permanent parenting plan by unilaterally enrolling the eldest child at Baylor. Although both parties sought essentially equal co-parenting time, the father also requested modification of the permanent parenting plan to designate him as the primary residential parent. Each party requested sole educational decision-making authority. Following a bench trial as to the first petition, the trial court, _inter alia_, approved the parties' stipulation that a material change in circumstance had occurred since entry of the prior order; maintained the mother as the primary residential parent; maintained joint decision-making authority; found that although the mother had unilaterally enrolled the eldest child at Baylor, it was in the child's best interest to remain at the school; and found that an upward deviation in the father's child support obligation was appropriate to fund sixty percent of the Baylor tuition for the eldest child. During a subsequent bench trial on the mother's second petition, the Baylor financial aid director, who had testified during the first trial concerning typical financial aid awards, testified that neither of the children at issue had been awarded financial aid for the upcoming year. The trial court _sua sponte_ amended its prior order to reduce the upward deviation in the father's child support obligation to fifty percent of the Baylor tuition for the eldest child and to eliminate the father's responsibility for any extracurricular expenses at Baylor. The trial court entered a separate judgment dismissing the mother's petition as to the middle child but including a provision that the mother would be allowed to enroll the middle child at Baylor or another private school provided that the father was not

_____
[1] Upon the appellant's motions, this Court entered an order on August 18, 2020, consolidating the appellant's appeal in case number E2020-00712-COA-R3-CV with this appeal.

responsible for any portion of the tuition. The trial court incorporated its rulings into a modified permanent parenting plan that included a prohibition against enrollment of the third child in private school absent agreement of the parties or a subsequent court order. The father has appealed both judgments. Having determined that the upward deviation in child support for the eldest child should be capped at no more than fifty percent of the 2020-2021 Baylor tuition amount testified to at the time of trial, we modify the deviation to equal the lesser of (a) $13,200.00 annually or (b) fifty percent of the current annual Baylor tuition each year for the eldest child after deduction of proceeds from scholarships, grants, stipends, or other cost-reducing programs received by or on behalf of the child. We affirm the trial court's judgments in all other respects and deny the father's request for attorney's fees on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed as Modified; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and W. NEAL MCBRAYER, JJ., joined.

Sandra J. Bott, Chattanooga, Tennessee, for the appellant, James Michael Bastone.

Jennifer H. Lawrence and David H. Lawrence, Chattanooga, Tennessee, for the appellee, Kimber Keplinger Bastone.

**OPINION**

I. Factual and Procedural Background

The petitioner, Kimber Keplinger Bastone ("Mother"), and the respondent, James Michael Bastone ("Father"), were married in May 2005 and were divorced by final decree entered in April 2013 by the Hamilton County Circuit Court ("trial court"). The trial court also entered a permanent parenting plan order at that time concerning the parties' three children: Stella, who at the time of the divorce judgment was six years of age; Amy, who was four; and Joseph, who was two (collectively, "the Children").

Upon Mother's subsequent petition for contempt and modification of child support, the trial court entered an agreed order on July 6, 2016, incorporating a modified permanent parenting plan order ("2016 PPP"). Under the 2016 PPP, Mother was designated the primary residential parent, as she had been in the original parenting plan, and Father enjoyed 145 days of annual co-parenting time. As pertinent on appeal, the parents were granted joint decision-making authority under the 2016 PPP, and Father's child support obligation was increased to $1,562.00 monthly from the prior amount of

$1,200.00. Father maintained the Children on his health insurance as he had in the initial parenting plan. The 2016 PPP also provided that Father would claim Stella and Amy as dependents on his federal income tax return while Mother would claim Joseph as a dependent. Concerning the Children's schooling and extracurricular activities, the 2016 PPP included the following special provisions:

1.    The children shall attend Lookout [Mountain] Elementary School or CSAS [Chattanooga School for the Arts and Sciences] for the school year 2016-2017.

2.    Mother shall be responsible for 20% and Father shall be responsible for 80% of all agreed upon summer/athletic camps, before and after school care provided by the children's school, and any additional work related child care as agreed upon by the parties in advance. Neither party shall unreasonably withhold consent.

3.    The cost of all agreed upon extracurricular activities shall be equally divided by the parties. Neither party shall unreasonably withhold consent.

The trial court in the 2016 agreed order dismissed Mother's contempt petition upon directing Father to pay a lump sum of $7,500.00 to Mother "as satisfaction of all claims."

Mother initiated the first of the instant actions when she filed a petition to modify the 2016 PPP on April 2, 2018, alleging that "there [had] been a substantial change of material circumstances" in that Stella had "educational opportunities" at Baylor and that it was in Stella's best interest to attend Baylor. Mother requested modification of the 2016 PPP to require the parties to enroll Stella at Baylor and "share the expense of the private school tuition on a *pro rata* basis." Mother also requested that Father's co-parenting time be increased by one evening on alternate weeks and that she be awarded reasonable attorney's fees.

Father filed an answer and counter-petition on May 2, 2018, also asserting that a material change in circumstance had occurred but alleging that Mother was in contempt of court for violation of the 2016 PPP because she had "changed the children's schools multiple times," attempted to unilaterally enroll Stella at Baylor, and registered the Children for extracurricular activities under Mother's maiden name. Father also alleged that a "significant variance" existed between the amount of child support ordered in 2016 and the amount that would now be required under the Tennessee Child Support Guidelines ("the Guidelines"). In partial support of the latter allegation, Father averred that Mother was voluntarily underemployed. Father also requested an award of

reasonable attorney's fees. Father attached a proposed permanent parenting plan in which he would be designated the primary residential parent and the sole decision-maker for the Children's education. He also proposed modifications to include equal co-parenting time (182.5 annual days for each parent) and an equal split of costs between the parents for agreed-upon summer camps.

Mother filed an answer to the counter-petition, denying all substantive allegations against her. Admitting that a variance existed between the amount of child support ordered and the amount indicated by the Guidelines, Mother stated that she "lack[ed] sufficient information to admit that the variance [was] significant." Mother subsequently filed a motion to amend her petition for modification to add an allegation that Father was in contempt of the 2016 PPP because he had refused to pay his share of the Children's summer camp expenses in 2018. Mother alleged that she had informed Father that the Children would be attending summer camps in 2018 and that he had impliedly agreed because he did not object. Mother attached a proposed permanent parenting plan to her amended petition, which included a designation that she would have sole decision-making authority for educational matters and the Children's extracurricular activities.

Father filed an objection to Mother's proposed amendment and attached a letter from his counsel to Mother's counsel, dated March 19, 2018, in which Father had objected to a "schedule" that Mother had sent him for summer camps because of the $9,741.75 total cost and because the parents had not agreed upon the Children's attendance. The trial court entered an order on July 9, 2018, allowing Mother to amend her petition pursuant to Tennessee Rule of Civil Procedure 15, and Father filed an amended response.

The trial court conducted a bench trial on November 5, 2019, concerning Mother's petition to modify as to Stella, who was by then nearly thirteen years of age. Upon a motion filed by Mother and stipulation of the parties at the beginning of trial, the court ordered that Mother would assume responsibility for health insurance for the Children because they could be covered economically on a health insurance plan maintained by her current husband, whom Mother had married in November 2018. Also upon the parties' stipulation, the court ruled, pursuant to Tennessee Code Annotated § 36-6-101(a)(2)(B) and -101(a)(2)(C), that a material change in circumstance had occurred since entry of the 2016 PPP warranting review of the primary residential parent designation as well as other provisions of the 2016 PPP. During trial, the court heard testimony from Mother; Father; Bill Murdock, the Director of Financial Aid at Baylor; and the Children's maternal grandmother ("Maternal Grandmother").

Having found no limiting factors on co-parenting time for either parent, pursuant to Tennessee Code Annotated § 36-6-406(a)-(d), the trial court proceeded to consider the

best interest factors under Tennessee Code Annotated § 36-6-106(a).  The court determined that the 2016 PPP should be modified to, *inter alia*, provide Mother with 183 days and Father with 182 days of co-parenting time with the Children, maintain Mother as the primary residential parent, and set a deviation from the Guidelines support amount to allow Stella to attend Baylor with Father directed to pay sixty percent of the tuition due after financial aid.  The court maintained the parents' joint decision-making authority for all major decisions, including those involving education and extracurricular activities. The court noted Mr. Murdock's testimony that at the time of the November 2019 trial, Baylor's yearly tuition was $25,440.00.  The court made detailed findings of fact as to the best interest factors, which were subsequently memorialized in an order and incorporated memorandum opinion entered on March 9, 2020.[2]

In general, the trial court found in its March 2020 order that each of the parents was equally fit to care for the Children and was committed to resolving conflict and abiding by the provisions of a permanent parenting plan.  However, within the second best interest factor concerning cooperation with the other parent, the court found that Mother had "made a unilateral decision to enroll Stella at Baylor" and that as a result of Mother's making that decision "without Father's commitment to defray any of the costs and with knowledge that Father objected to paying for Baylor tuition, and also as a result of Mother's unilaterally enrolling the minor children in summer camps of about $9,000," the factor "slightly favor[ed] Father."  On appeal, Mother does not deny that she unilaterally enrolled Stella at Baylor or that by the time of the November 2019 trial, Stella was in her second year of attendance at Baylor.  Mother does rely on undisputed testimony that she paid the first year and partially paid the second year of Stella's tuition from a settlement she received in 2018 after she sustained injuries in a 2015 automobile accident, as well as Maternal Grandmother's testimony that Maternal Grandmother had contributed approximately $7,000.00 to Stella's tuition and was willing to contribute again if necessary.

The trial court found that Father's gross monthly income was $9,662.17, or $115,946.00 annually.[3]  The court also found that Mother's gross monthly income was $1,386.67, or $16,640.00 annually.  The court credited Mother's testimony in finding that she was not employed full-time due to a physical limitation. Mother testified that she was employed part-time as a yoga and fitness instructor; however, she also testified that she

---

[2] In entering the March 2020 order, the trial court adopted Mother's proposed order, noting by handwritten addition that it had done so "after hearing and resolving differences between the parties' proposed orders."

[3] The trial court's March 2020 order contained a nominal mathematical error, calculating Father's gross annual income to be $115,948.00, rather than $115,946.00.

was physically unable to sit at a desk for long periods of time and had difficulty typing due to injuries resulting from her automobile accident. According to the Guidelines, the court approved calculation of Father's basic child support obligation in the amount of $1,340.00 per month. In determining that an upward deviation in Father's child support obligation was warranted to facilitate Stella's Baylor tuition, the court expressly considered the provision for "extraordinary expenses" in the Guidelines, *see* Tenn. Comp. R. & Regs. 1240-02-04-.07, as well as "the equity between the parties," *see* Tenn. Code Ann. § 36-5-101(e)(1)(A).

Meanwhile, Mother had filed a second petition for modification of the 2016 PPP on December 19, 2019, asserting that there had been a material change in circumstance as to Amy because Amy would be graduating from fifth grade at a public school, Lookout Mountain Elementary School, in the spring of 2020 and would be eligible to enroll in Baylor or "an alternate private school." Mother requested a modification "requiring the parties to enroll and send" Amy, then eleven years of age, to Baylor or an alternate private school and "to share the expense of the private school tuition, after the award of any financial aid, on a *pro rata* basis." Mother also requested an award of reasonable attorney's fees. In an answer requesting dismissal of this petition, Father denied that the parties should be required to "share in the expense of private school tuition" and averred that private elementary or secondary schooling was not appropriate to the parents' financial abilities or to the Children's lifestyle and would not have been even if the parents had continued living together.

The trial court entered the March 2020 order prior to conducting a bench trial on the same day concerning Mother's second petition to modify the 2016 PPP. Father had filed a motion for judgment on the pleadings on February 11, 2020, seeking dismissal of Mother's second modification petition based on Mother's "exclusion of the Father from educational decision making regarding Mother's unilateral enrollment of Amy at Baylor" as an alleged violation of the 2016 PPP. Mother had filed a response requesting that the motion be denied and stating that she had not unilaterally enrolled Amy at Baylor but had simply completed an application and sought financial aid as the trial court had ruled would be permissible. At the beginning of the second trial, the court orally denied Father's motion for judgment on the pleadings.

During the second trial, the trial court again heard testimony from the parties, Maternal Grandmother, and Mr. Murdock. On April 22, 2020, the court entered two separate orders: one was a *sua sponte* order amending the order previously entered on March 9, 2020, pursuant to Tennessee Rule of Civil Procedure 59.05, and the second was an order concerning Mother's petition as to Amy. In both of the April 2020 orders, the court noted that Mr. Murdock had testified during the March 2020 trial that because Baylor had been severely limited in the number of students who could be awarded

financial aid for the coming academic year, neither Stella nor Amy would be receiving financial aid to assist with the school's tuition. Testimony demonstrated that although Father had not participated in any financial aid application, Mother had applied for financial aid for Amy as well as Stella.

In its order amending the March 2020 order, the trial court found that Father's responsibility for Stella's Baylor tuition should be fifty percent rather than the sixty percent previously ordered. The court also directed that Father would "not be required to pay for summer camps" and would "not have to pay for extracurricular activities or books or board or fees or other expenses" for Stella at Baylor. The court maintained Father's child support obligation prior to the upward deviation for Stella's Baylor tuition at $1,340.00 monthly, which was the amount that had been determined in the March 2020 order. Applicable to all of the Children, the court incorporated an attached modified permanent parenting plan order ("Modified PPP") and child support worksheet into its amended order. Previously, with the March 2020 order, the trial court had entered a permanent parenting plan, which was then superseded by the Modified PPP entered with the April 2020 orders.

In its April 2020 order specifically concerning Amy, the trial court denied Mother's request for an upward deviation from the Guidelines to require Father to provide any portion of Amy's private school tuition. However, the court directed that the parties could agree to use Father's residence as the primary residential parent's residence for school zoning purposes or "in the alternative, [Mother] may enroll [Amy] at Baylor School, Chattanooga Christian School, or a public school, but [Father] is not obligated for the Baylor School or Chattanooga Christian School tuition for [Amy] under the current circumstances." The court expressly incorporated the Modified PPP and child support worksheet.

In entering the order concerning Amy, the trial court essentially adopted Mother's proposed order except that the court added a handwritten and initialed provision that Mother's December 2019 petition was "dismissed." After Mother had filed the proposed order but before the order's entry by the trial court, Father had filed an objection, asserting that the phrase, "under the current circumstances," did not match the trial court's oral ruling and improperly laid groundwork for Mother to seek Father's payment of Amy's private school tuition through the filing of future petitions to modify the Modified PPP. The trial court, however, entered the order with the phrase, "under the current circumstances," intact.

In the Modified PPP, the trial court included the following special provisions relevant to the issues on appeal:

1.    Joseph shall remain at Lookout Mountain Elementary, unless the parties agree otherwise, be that informally or by mediation or the Court orders.

2.    Joseph may not be enrolled or financially committed in any way to a private school without agreement of the parties informally or by mediation or the Court orders it. This is subject to a contempt action, subject by $50 fine and/or ten days in jail for each proven willful violation. The parties shall go to mediation for disputes, including educational decisions in the future for Joseph specifically. Any remaining dispute after mediation must come before the Court for a decision.

3.    [Stella] may attend Baylor School.

4.    Mother may enroll [Amy] at Baylor School, Chattanooga Christian School, or a public school[;] however, the Father is not obligated for any of [Amy's] tuition at a private school.[4]

5.    Mother shall be responsible for 20% and Father shall be responsible for 80% of all before and after school care provided by the children's school, except for those for [Stella] if at a private school, and any additional work-related child care as agreed upon by the parties in advance. Neither party shall unreasonably withhold consent.

6.    Neither Father nor Mother are responsible for paying for summer/athletic camps unless they agree that they will share the expense.

7.    Except for the extracurricular expenses for [Stella] at a private school which Father is not required to pay, the cost of all extracurricular activities shall be equally divided by the parties. Neither party shall unreasonably withhold consent.

Father filed separate timely notices of appeal from the April 2020 orders. Upon Father's subsequent motions, this Court entered an order on August 18, 2020, consolidating the appeals.

---

[4] We note that, as in the trial court's order regarding Amy, the phrase, "under the current circumstances," is added to this provision as it is repeated within the "Child Support" section of the Modified PPP.

## II. Issues Presented

Father presents the following issues for our review, which we have restated slightly as follows:

1.      Whether the trial court erred by requiring Father to pay any portion of the Baylor tuition for Stella.

2.      In the alternative, whether the trial court abused its discretion by finding that the obligation to pay private school tuition would be appropriate to the parents' finances and Stella's lifestyle if the parents and Stella were still living together.

3.      Whether the trial court abused its discretion by finding that Amy should be enrolled in private school over Father's objection because such was purportedly in violation of the 2016 PPP.

4.      Whether Father is entitled to an award of reasonable attorney's fees on appeal pursuant to Tennessee Code Annotated § 36-5-103(c).

## III. Standard of Review

We review a non-jury case *de novo* upon the record with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006). We review questions of law *de novo* with no presumption of correctness. *See Bowden*, 27 S.W.3d at 916 (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998)); *see also In re Estate of Haskins*, 224 S.W.3d 675, 678 (Tenn. Ct. App. 2006). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

Determinations regarding child support are reviewed under an abuse of discretion standard. *See Mayfield v. Mayfield*, 395 S.W.3d 108, 114-15 (Tenn. 2012); *State ex rel. Williams v. Woods*, 530 S.W.3d 129, 136 (Tenn. Ct. App. 2017). As this Court has explained:

Prior to the adoption of the Child Support Guidelines, trial courts had wide discretion in matters relating to child custody and support. *Hopkins v. Hopkins*, 152 S.W.3d 447, 452 (Tenn. 2004) (Barker, J., dissenting). Their discretion was guided only by broad equitable principles and rules which took into consideration the condition and means of each parent. *Brooks v. Brooks*, 166 Tenn. 255, 257, 61 S.W.2d 654, 654 (1933). However, the adoption of the Child Support Guidelines has limited the courts' discretion substantially, and decisions regarding child support must be made within the strictures of the Child Support Guidelines. *Berryhill v. Rhodes*, 21 S.W.3d 188, 193 (Tenn. 2000); *Jones v. Jones*, 930 S.W.2d 541, 545 (Tenn. 1996); *Smith v. Smith*, 165 S.W.3d 279, 282 (Tenn. Ct. App. 2004).

* * *

Because child support decisions retain an element of discretion, we review them using the deferential "abuse of discretion" standard. This standard is a review-constraining standard of review that calls for less intense appellate review and, therefore, less likelihood that the trial court's decision will be reversed. *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000); *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222-23 (Tenn. Ct. App. 1999). Appellate courts do not have the latitude to substitute their discretion for that of the trial court. *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000). Thus, a trial court's discretionary decision will be upheld as long as it is not clearly unreasonable, *Bogan v. Bogan*, 60 S.W.3d 721, 733 (Tenn. 2001), and reasonable minds can disagree about its correctness. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001); *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000). Discretionary decisions must, however, take the applicable law and the relevant facts into account. *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). Accordingly, a trial court will be found to have "abused its discretion" when it applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003); *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn. 2001); *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999).

*Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005).

Regarding adherence to the Child Support Guidelines, this Court has explained:

> In Tennessee, awards of child support are governed by the Child Support Guidelines ("the Guidelines") promulgated by the Tennessee Department of Human Services Child Support Services Division. Tenn. Code Ann. § 36-5-101(e)(2). Tennessee's Child Support Guidelines have the force of law. *Jahn v. Jahn,* 932 S.W.2d 939, 943 (Tenn. Ct. App. 1996). Statutes and regulations pertaining to child support are intended to "assure that children receive support reasonably consistent with their parent or parents' financial resources." *State ex rel. Vaughn v. Kaatrude,* 21 S.W.3d 244, 248-49 (Tenn. Ct. App. 2000); *see also* Tenn. Comp. R. & Regs. 1240-02-04-.01(3)(e). Courts are therefore required to use the child support guidelines "to promote both efficient child support proceedings and dependable, consistent child support awards." *Kaatrude,* 21 S.W.3d at 249; *see also* Tenn. Code Ann. § 36-5-101(e); Tenn. Comp. R. & Regs. 1240-02-04-.01(3)(b), (c).

*Williams*, 530 S.W.3d at 137 (quoting *Sykes v. Sykes*, No. M2012-01146-COA-R3-CV, 2013 WL 4714369, at *2 (Tenn. Ct. App. Aug. 28, 2013) (footnote omitted in *Williams*)).

## IV. Modification of 2016 PPP

In her amended petition, Mother requested, *inter alia*, that the trial court modify the 2016 PPP to (1) include a requirement that the parents enroll Stella at Baylor and share the tuition expense on a *pro rata* basis, (2) designate Mother as the sole decision-maker for educational and extracurricular matters, and (3) increase Father's annual co-parenting days from 145 to 182. Essentially, the parties agreed as to what the modified residential co-parenting schedule should be. Father and Mother each respectively testified that the Children had been spending more days with Father than the amount prescribed by the 2016 PPP, and neither expressed disagreement over the mechanics of their typical daily or holiday schedule. In his counter-petition, however, Father requested modifications to increase his co-annual co-parenting days to 182.5 days, affording Mother 182.5 days also, and then to designate Father as the primary residential parent and the sole educational decision-maker. During the November 2019 trial, Father testified, and his counsel emphasized, that Father's rationale for requesting designation as the primary residential parent was that he believed it would be in the Children's best interest to have their primary residence located in the public school zoning district for Signal Mountain where Father resided. As to educational decision-making, Father testified that future conflict could be avoided if he alone possessed that authority, and Mother likewise testified that future conflict could be avoided if she alone possessed that authority.

The trial court in its Modified PPP ultimately adopted Mother's proposal that she be granted 183 days of annual co-parenting time and remain designated as the primary residential parent. However, the court declined to grant either parent's request for sole authority over educational decisions, instead maintaining the parents' joint authority in that regard. Other than the modifications concerning private school enrollment and tuition expenses, the only substantive modifications made to the 2016 PPP were the increase in Father's co-parenting time, upon which the parties essentially agreed, and the stipulated change in health insurance. On appeal, Father has not raised an issue concerning the trial court's denial of his request to be designated as primary residential parent. As to Father's rationale for requesting the designation, the trial court granted Father partial relief in its April 2020 order regarding Mother's second petition by including a provision allowing the parties in the future to use Father's residence as the primary residential parent's residence for school zoning purposes if they could so agree.

Father has raised issues on appeal concerning the trial court's findings that he should be required to pay fifty percent of Stella's Baylor tuition expenses and that Amy may be enrolled at Baylor. Although Father's arguments as to these issues are grounded somewhat in the trial court's treatment of the parties' joint educational decision-making status, neither parent has raised an issue regarding the trial court's finding that the parents should retain joint educational decision-making authority. Therefore, the crux of the dispute on appeal involves the upward deviation in Father's child support obligation for Stella's private school tuition and his concern that this will be required in the future for Amy. Before addressing this central dispute, however, we first consider the trial court's threshold finding that a material change in circumstance had occurred since entry of the 2016 PPP that warranted consideration of the requested modifications and the trial court's subsequent best interest analysis.

A. Material Change in Circumstance

As the trial court noted at the beginning of the November 2019 trial, Father's request to be designated the primary residential parent rendered this action to be one concerning a modification of "custody" in addition to one concerning modifications to the residential co-parenting schedule, educational provisions, and child support. *See Armbrister v. Armbrister,* 414 S.W.3d 685, 703 (Tenn. 2013) (comparing the standard for an action to modify custody to the standard for an action to modify only a residential parenting schedule). Upon a petition to modify custody from one parent to the other parent, "the 'threshold issue' is whether a material change in circumstance has occurred after the initial custody determination." *See Kendrick v. Shoemake,* 90 S.W.3d 566, 570 (Tenn. 2002) (quoting *Blair v. Badenhope,* 77 S.W.3d 137, 150 (Tenn. 2002)). Upon a trial court's finding that a material change in circumstance affecting the children has occurred, "it must then be determined whether the modification is in the child[ren]'s best

interests." *Kendrick,* 90 S.W.3d at 570 (citing Tenn. Code Ann. § 36-6-106); *see generally Boyer v. Heimermann,* 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007) ("In approaching questions of custody and visitation, the needs of the children are paramount; the desires of the parents are secondary.").

Regarding the standard a petitioning parent must meet to prove a material change in circumstance sufficient for consideration of whether custody modification is in the best interest of the child, Tennessee Code Annotated § 36-6-101(a)(2)(B) (2017) provides in pertinent part:

> (B)    If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

*See Armbrister,* 414 S.W.3d at 703.[5]

In its March 2020 order, the trial court found that the parties had "stipulated that unanticipated material changes in circumstances have arisen since the Order of July 6, 2016 that affect the children's wellbeing in a meaningful way." The trial court further

---

[5] In contrast, Tennessee Code Annotated § 36-6-101(a)(2)(C) (2017) sets forth the less stringent standard required to prove a material change in circumstance sufficient for consideration of whether a modification in the residential parenting schedule is in the best interest of the child:

> If the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

*See Armbrister,* 414 S.W.3d at 703-04 (noting the lower threshold required for a finding of a material change of circumstance when considering a modification of a residential parenting schedule as opposed to a change in the primary residential parent).

found that the parents had "demonstrated a material change in circumstances that entitle[d] the parties to a hearing on their petitions for modification." The November 2018 trial transcript demonstrates that at the beginning of trial, the court questioned the parties' respective counsel regarding the factual bases for their stipulation and whether Mother's agreement to the stipulation rose to the standard required for consideration of a custody modification. Although the trial court did not specifically state in its order the facts upon which the stipulation was based, the transcript supports the court's finding that the parties stipulated at trial to a material change in circumstances warranting review of the primary residential parent designation as well as other provisions of the 2016 PPP.

Moreover, neither parent on appeal has contested the trial court's finding of a material change in circumstance. *See Lovlace v. Copley*, 418 S.W.3d 1, 35 (Tenn. 2013) ("Courts need not make findings on stipulated or undisputed facts, unless conflicting inferences can be drawn from undisputed facts."); *see, e.g.*, *Gider v. Hubbell*, No. M2016-00032-COA-R3-JV, 2017 WL 1178260, at *6 (Tenn. Ct. App. Mar. 29, 2017) (proceeding directly to a best interest analysis in a modification action concerning custody when "both parties stipulated that a material change had occurred" and the mother did "not contest the juvenile court's finding of a material change in circumstances"); *In re Jordin M.*, No. M2013-02275-COA-R3-JV, 2015 WL 1650243, at *9 (Tenn. Ct. App. Apr. 9, 2015) (same); *cf. Tutor v. Tutor*, No. W2019-00544-COA-R3-CV, 2020 WL 1158075, at *2-4 (Tenn. Ct. App. Mar. 10, 2020) (vacating the trial court's finding that a material change in circumstance had occurred and remanding for additional findings when the trial court "failed to delineate between the standard for modification of custody and modification of the parenting schedule" and the mother contested on appeal the trial court's finding regarding the standard necessary for consideration of a custody change). We therefore determine that the threshold matter of a material change in circumstance has been established.

B. Best Interest of the Children

Having found that a material change in circumstance had occurred, the trial court was then required to apply the statutory "best interest" factors enumerated in Tennessee Code Annotated § 36-6-106(a) (2017) to determine whether Father's requested change to the primary residential parent and the other requested modifications to the 2016 PPP were in the best interest of the Children. *See Armbrister*, 414 S.W.3d at 697-98. Tennessee Code Annotated § 36-6-106(a) provides:

> In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the

court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:

(1)     The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2)     Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3)     Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4)     The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5)     The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6)     The love, affection, and emotional ties existing between each parent and the child;

(7)     The emotional needs and developmental level of the child;

(8)     The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child.  The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3).  The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9)     The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10)    The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11)    Evidence of physical or emotional abuse to the child, to the other parent or to any other person.  The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12)    The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13)    The reasonable preference of the child if twelve (12) years of age or older.  The court may hear the preference of a younger child upon request.  The preference of older children should normally be given greater weight than those of younger children;

(14)    Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15)    Any other factors deemed relevant by the court.

*See also* Tenn. Code Ann. § 36-6-404(a)-(b) (2017) (setting forth statutory requirements for the provisions of a permanent parenting plan).

In its March 2020 order, the trial court made the following best interest findings. With an eye toward Father's specific issues on appeal, we have placed emphasis on those findings pertinent to the trial court's decision regarding Stella's attendance at Baylor and the parents' respective responsibilities for the tuition:

As to [the] factor that both parents should have the maximum participation possible, etc., Mother and Father have proposed that each have substantially equal time, and the Court finds that its parenting order maximizes the participation of both parents.

As to factor one, the Court credits Mother's testimony. Further, considering the fact of the time that has passed, Mother is performing the majority of the parenting responsibilities for the daily needs of the children. Also considering the children's family and friends on Lookout Mountain over the past two and half years, and the fact that Joseph has known only Lookout Mountain school, this factor favors the Mother.

As to factor two, the Court credits the evidence of Mother's good-faith efforts to parent and resolve conflict, and the Court finds that both sides are committed to resolving conflict in the future. Father testified the parties were doing very well in regards to planning, transportation, and related issues. Thus, the Court finds that both parents will honor and facilitate the parenting arrangement. However, also applicable in factor two is the fact that Mother made a unilateral decision to enroll Stella at Baylor School. The Court finds that as a result of the unilateral decision to enroll Stella at Baylor without Father's commitment to defray any of the costs and with knowledge that Father objected to paying for Baylor tuition, and also as a result of Mother unilaterally enrolling the minor children in summer camps of about $9,000, this factor slightly favors Father.

Factor number three, as to the parenting seminar, is not applicable here.

As to factor four, the Court credits the evidence that financial aid for Baylor School tuition is available and would apply up to a capped amount of $20,000 of the current tuition of $25,440. After determining the amount that each parent can pay upfront, the remainder is called the "demonstrated need." The Court credits [Mother's] witness, Mr. Bill Murdock, who

testified that the average financial aid covers 67 percent of demonstrated need, and the Court refers also to Exhibit 5[6] for that fact.

Both Mother and Father have demonstrated the disposition to provide the minor children with food, clothing, medical care, education, and other necessary care.  But this factor favors Father.

As to factor five, the Court credits the testimony, and it is apparent from the record including the current permanent parenting plan, that Mother has been the primary caregiver and has taken the greater responsibility for performing parental responsibility; therefore, factor five favors Mother.

As to factor six regarding the love, affection, and emotional ties existing between each parent and the child, the Court finds [factor six] favors for both parties equally.

As to factor seven, the Court credits the evidence that Stella is doing well at Baylor.  Stella has good grades.  Stella is in honors math . . . . Factor seven favors Mother's proposal.

As to factor eight, the moral, physical, mental, and emotional[] fitness, the Court finds that both parties are sufficiently morally, physically, mentally, and emotionally fit to provide care for all three minor children. Thus, factor eight is equally weighted for both parents.

As to factor nine, the Court credits the testimony that Stella has been at Baylor School for about one and a half years, and Amy and Joseph have been at Lookout Mountain Elementary School.  There are relatives on Lookout Mountain for these children.  And Father admits it would be rather hard at this point to pull Stella out of Baylor School.  Therefore, that factor favors Mother.

As to factor ten, the Court credits the evidence that Stella has been at Baylor School for about one and half years, and it is in her best interest if she stays and the other children stay where they are until there is a joint decision either informally or by mediation or a court decision.  Further, the children need to stay together for visitation.  Pulling Stella out of Baylor School would be harmful for her education.  It would be harmful for Stella

---

[6] Exhibit 5 was a "Family Contribution Report" produced by School and Student Services, which, according to Mr. Murdock, was the outside organization to which Baylor applicants' parents or guardians would report their financial information for Baylor's use in making financial aid awards.

socially. It would possibly be harmful for Stella psychologically, and possibly gravely so. Stella has her "best friends" at Baylor School. Stella loves her school. Stella participates in several extracurricular activities, including lacrosse, at Baylor School. Stella is a child of routine. Father agrees it would be hard on Stella to pull her out of Baylor School at this point in time. Factor ten favors Mother.

There is no evidence regarding factor eleven, thus it is not applicable.

As to factor twelve, the Court credits the evidence that there is no problem with the character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child. There was nothing adverse or harmful there that was testified to. In fact, it was just the opposite. There are no issues with regard to this factor so factor twelve is not applicable.

As to factor thirteen, there was no testimony of the reasonable preference of the children, thus that factor is not applicable.

As to factor fourteen, both Mother's employment schedule and Father's employment schedule are somewhat flexible. However, Mother cannot work a desk job. That factor slightly favors Mother.

The Court does [not] deem any other factors relevant or applicable.

(Paragraph lettering omitted.) The trial court also expressly found in its March 2020 order that neither parent's residential time with the Children should be restricted by any of the limiting factors delineated in Tennessee Code Annotated § 36-6-406(a)-(d) (2017). *See Armbrister*, 414 S.W.3d 685 at 696 ("Before forging a residential schedule, a court must first determine whether either parent has engaged in any of the misconduct specified in Tennessee Code Annotated section 36-6-406 . . . which necessitates limiting the parent's residential time with the child." ) (internal citations and footnote omitted).

Upon consideration of all of the above factors, the trial court determined that Mother should remain the primary residential parent of the Children while stating in its March 2020 order that "this designation is solely for the purposes of any applicable state and federal laws." In this order and in the subsequently entered Modified PPP, the trial court set forth a residential parenting schedule affording Mother 183 days and Father a nearly equal 182 days with the Children, complete with detailed provisions concerning daily, holiday, and vacation scheduling.

- 19 -

Apart from the special provisions concerning particular schools and tuition expense, the trial court applied the same analysis to determine that in general, all major decision-making authority should remain joint, denying each parent's respective request to be designated the sole educational decision-maker as well as Mother's request to have sole authority over extracurricular activities. *See Brunetz v. Brunetz*, 573 S.W.3d 173, 183-84 (Tenn. Ct. App. 2018) ("A modification in decision-making authority is analyzed utilizing the same standards governing any modification of the parenting plan." (citing *Gider*, 2017 WL 1178260, at *5)). We note that although some of the trial court's findings are particular to Stella and her attendance at Baylor, the court's analysis addressed the best interest of all three Children, and the Modified PPP was likewise designed to govern the parenting of all three Children.

On appeal, Father does not argue that the trial court erred in finding that at the time of the November 2019 trial, it was in Stella's best interest to remain enrolled at Baylor. In general, we conclude that the trial court properly applied the statutory process of determining whether a material change in circumstance warranting the requested modifications to the 2016 PPP had occurred and analyzing the best interest of the Children in relation to those requested modifications. Moreover, upon careful review, we determine that the evidence does not preponderate against the trial court's finding that it was in Stella's best interest to remain enrolled at Baylor. Having so determined, we proceed now to Father's issues concerning his financial obligation for Stella's Baylor tuition expenses and his issue concerning Amy's potential enrollment at Baylor.

### C. Father's Obligation toward Stella's Private School Tuition

Father argues (1) that the trial court was precluded from ordering him to pay any part of Stella's Baylor tuition by the court's finding that Mother had unilaterally decided to enroll Stella at Baylor and (2) that in the alternative, the trial court abused its discretion by finding that the parties' finances allowed for one child to attend Baylor with a fifty-percent contribution from Father. We will address each of Father's arguments concerning Stella's Baylor tuition in turn.

### 1. Effect of Mother's Unilateral Decision to Enroll Stella

Father posits that the trial court erred by requiring him to pay any portion of Stella's Baylor tuition because Mother's previous unilateral enrollment of Stella at Baylor violated the joint decision-making provision of the 2016 PPP. Father essentially argues that Mother's action precluded the trial court from finding that he had any obligation to contribute to Stella's Baylor tuition. For her part, Mother does not question the trial court's finding that she had unilaterally enrolled Stella at Baylor. However,

Mother argues that the trial court properly determined that it was in Stella's best interest to continue attending Baylor and that once this determination had been made, it was within the trial court's discretion to find that an upward deviation in Father's child support obligation was warranted to pay a portion of Stella's Baylor tuition. Upon careful review of the record and applicable authorities, we conclude that Mother's past unilateral decision to enroll Stella at Baylor did not preclude the trial court from requiring Father to pay a portion of Stella's tuition upon the trial court's determination that it was in Stella's best interest to remain at Baylor.

In support of his position, Father relies heavily on this Court's decision in *Pua-Vines v. Vines*, No. E2016-02472-COA-R3-CV, 2017 WL 3283415 (Tenn. Ct. App. Aug. 2, 2017). In *Pua-Vines*, the parties had entered into an "Agreement in Contemplation of Divorce," which included a provision regarding their two children's private school expenses that was subsequently incorporated into a modification of their permanent parenting plan order eight years following entry of the parties' divorce decree. *Pua-Vines*, 2017 WL 3283415, at *1-2. The provision stated:

> The parties shall each pay one-half (50%) of all private school tuition, school supplies, fees, extra-curricular expenses, school trips, sport activities, graduation expenses, and any and all other school or extracurricular expenses incurred on behalf of the minor children of the parties, which expenses <u>have been mutually agreed upon in advance of incurring the same</u>.

*Id.* at *2 (emphasis added). The parenting plan also provided that the parties would have joint decision-making authority over educational decisions. *Id.*

The mother in *Pua-Vines* filed a petition for modification of the parenting plan and for contempt, asserting, *inter alia*, that the father had unreasonably withheld consent for the eldest child to enter Girls Preparatory School ("GPS") in Chattanooga, had failed to pay his share of extracurricular expenses for the children, and had stated that he did not intend to pay any part of the GPS tuition. *Id.* The father filed a counter-petition for modification and contempt, averring that the mother had willfully violated the parenting plan order by enrolling the eldest child at GPS without his agreement. *Id.* During the ensuing bench trial, the father presented testimony from the director of admissions at Notre Dame High School ("Notre Dame"), a private Catholic high school that was the father's school of choice for the children. *Id.* at *3 n.3.

As pertinent to this analysis, the trial court in *Pua-Vines* determined that the eldest child would be permitted to attend GPS and ordered the father to pay the equivalent of one-hundred percent of tuition expenses at Notre Dame, or $11,427.00, toward the GPS

tuition, which was $23,450.00 at that time. *Id.* at \*3-6. On appeal, this Court reversed the trial court's order in this regard upon determining that the mother "acted unilaterally in enrolling the older child at GPS; this was a clear violation of the parties' agreement." *Id.* at \*6. Although not precluding the eldest child from attending GPS, this Court concluded that the father would be required to pay the equivalent of one-half of the Notre Dame tuition for the upcoming year and each year going forward. *Id.* at \*6. This Court also found that the evidence preponderated in favor of the father's contention that he had been "excluded from the decision-making process." *Id.*

In the instant action, Father argues that *Pua-Vines* stands for the proposition that because Mother's unilateral enrollment of Stella at Baylor excluded him from the educational decision-making process, he cannot be required to pay any portion of Stella's Baylor tuition. We disagree. We find *Pua-Vines* to be factually distinguishable from this case because the parties in the instant action did not have an applicable agreement concerning the payment of private school tuition incorporated into the 2016 PPP under which they were operating. As this Court has explained regarding the incorporation of parties' agreements concerning child support into court orders:

> Tennessee law encourages divorcing parties to resolve by agreement their differences on issues including child support and will enforce such agreements, although certain portions remain subject to modification by the courts. *See Penland v. Penland*, 521 S.W.2d 222, 224 (Tenn. 1975). "When the husband and wife contract with respect to the legal duty of child support, upon approval of that contract, the agreement of the parties becomes merged into the decree and loses its contractual nature." *Id.* The child support provision loses its contractual nature because of the continuing statutory power of the Court to modify child support. *Id.* Thus, "any agreement between the parents regarding the payment of child support of a minor child is within the legal obligation to support the minor child and, therefore, is subject to court modification once the agreement is merged into a divorce decree." *Kesser v. Kesser*, 201 S.W.3d 636, 643 (Tenn. 2006).

*Vance v. Vance*, No. M2017-00622-COA-R3-CV, 2018 WL 1363323, at \*4 (Tenn. Ct. App. Mar. 16, 2018). Moreover, contrary to Father's proposition in the case at bar, the mother's unilateral decision in *Pua-Vines* did not foreclose any obligation on the father's part to contribute to the eldest child's tuition. *See Pua-Vines*, 2017 WL 3283415, at \*6. Instead, this Court concluded that the father should be responsible according to what he had agreed to in the parenting plan provision, fifty percent of the amount of tuition for his school of choice, which was Notre Dame. *Id.*

In the instant action, although the parties did have joint educational decision-making authority under the 2016 PPP, they had no agreement concerning private school tuition and expenses, including no agreement foreclosing private school. The trial court found in its March 2020 order that Mother had made a "unilateral decision to enroll Stella at Baylor without Father's commitment to defray any of the costs and with knowledge that Father objected to paying for Baylor tuition." The trial court considered this finding within its analysis of the best interest factor concerning "the willingness of each of the parents . . . to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents," *see* Tenn. Code Ann. § 36-6-106(a)(2), finding that this factor "slightly favor[ed] Father" because of Mother's unilateral decision. Throughout the proceedings, Father's objections to Stella's attendance at Baylor were based on his consistently held opinion that the parties could not afford Baylor's tuition. Father acknowledged that Stella was thriving at Baylor and that it would be difficult to "pull her out" of the school, which was part of his reasoning for stating that it would have been better never to have enrolled Stella at Baylor.

At the opening of the second trial on Amy's petition, Father presented his argument in support of his motion for a judgment on the pleadings, relying on his interpretation of *Pua-Vines* to argue that he should not be required to pay any portion of Baylor tuition for either child due to Mother's unilateral decisions.[7] The trial court denied Father's motion, noting the distinction between *Pua-Vines* and this case that we have described above. We note that the trial court did not require Father to reimburse Mother for any portion of the Baylor tuition to which she had unilaterally committed when she enrolled Stella for the first two years. In addition, the trial court included in the Modified PPP clear contempt consequences for Mother if she were to violate the court's order not to enroll Joseph in a private school without Father's agreement in the future.

Upon thorough review of the record, we conclude that the trial court properly considered Mother's unilateral enrollment of Stella at Baylor within its analysis of the unique circumstances of this case and the Children's best interest. *See Vance*, 2018 WL 1363323, at *6 ("Particularly because these matters 'are considered on a case-by-case basis,' Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(d), the trial court's findings are important."). The trial court did not abuse its discretion in finding that, given its conclusions regarding Stella's best interest, Father's child support obligation for a portion of Stella's Baylor tuition was not precluded by Mother's prior unilateral decision to enroll Stella.

---

[7] As Father's counsel conceded during this argument, Mother had not enrolled Amy at Baylor at the time of the second trial but had, with the trial court's prior permission, completed Baylor applications for entrance and financial aid on Amy's behalf.

## 2. Upward Deviation in Father's Child Support Obligation

Father also contends that the trial court abused its discretion by ordering an upward deviation in his child support obligation upon finding, pursuant to Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(d)(1)(i), that Stella's tuition expense would have been appropriate to the parents' finances and Stella's lifestyle if the parents had remained living together. Mother contends that the trial court did not abuse its discretion in finding the upward deviation appropriate to the parties' respective financial situations. We agree that the trial court did not abuse its discretion.

The Guidelines allow for the imposition of extraordinary expenses, including educational expenses, in addition to the award of an amount of support commensurate with the Guidelines:

> Extraordinary educational expenses may be added to the presumptive child support as a deviation. Extraordinary educational expenses include, but are not limited to, tuition, room and board, lab fees, books, fees, and other reasonable and necessary expenses associated with special needs education or private elementary and/or secondary schooling that are appropriate to the parents' financial abilities and to the lifestyle of the child if the parents and child were living together.

Tenn. Comp. R. & Regs. 1240-2-4-.07(2)(d)(1)(i). The Guidelines also provide for the consideration of "scholarships, grants, stipends, and other cost-reducing programs received by or on behalf of the child" when determining the amount of the deviation. *Id.* at -.07(2)(d)(1)(ii). As this Court has further elucidated:

> "[T]he guidelines contemplate private school tuition to be an 'extraordinary educational expense' because the tuition exceeds or departs from the cost of public schooling." *Barnett v. Barnett*, 27 S.W.3d 904, 907 (Tenn. 2000). "[P]ayment of extraordinary educational expenses is a separate component of an obligor's [basic child support obligation]" and a trial court "can order the obligor to pay less than the full amount of a child's (or children's) extraordinary educational expenses, depending upon the proof in a particular case." *Kaplan v. Bugalla*, 188 S.W.3d 632, 636 (Tenn. 2006); *Richardson v. Spanos*, 189 S.W.3d 720, 728-29 (Tenn. Ct. App. 2005) (holding that "this court has consistently approved arrangements requiring the non-custodial parent to pay only a portion of the private school expenses even when the non-custodial parent's income far exceeds that of the primary residential parent").

The child support provisions under the old guidelines stated that "'[e]xtraordinary educational expenses . . . *shall* be added to the percentage calculated in the above rule [setting out the percentage of net income to be paid as child support].'" *Kaplan*, 188 S.W.3d at 635 (citing *Barnett*, 27 S.W.3d at 907). However, "[i]n 2005 the child support guidelines were revised to provide that additional support for extraordinary educational expenses should be calculated separately and 'may' be added to the basic support award." *Id.* at 638 n.9. As stated earlier, the use of the word "may" connotes discretion on the part of the trial court, unless the context of the statute indicates otherwise. *Williams* [*v. McMinn Cty.*], 352 S.W.2d [430,] 433 [(Tenn. 1961)]. The change in wording under the Guidelines from "shall" to "may" is a clear indication that the imposition of the extraordinary expense of private school tuition is now a discretionary decision.

*Johnson v. Johnson*, No. M2008-00236-COA-R3-CV, 2009 WL 890893, at *10 (Tenn. Ct. App. Apr. 2, 2009).

In ordering a deviation from the Guidelines, a tribunal is required to include the following written findings of fact in its order:

1.    The reasons for the change or deviation from the presumptive amount of child support that would have been paid pursuant to the Guidelines; and

2.    The amount of child support that would have been required under the Guidelines if the presumptive amount had not been rebutted; and

3.    How, in its determination,

    (i)    Application of the Guidelines would be unjust or inappropriate in the particular case before the tribunal; and

    (ii)   The best interests of the child for whom support is being determined will be served by deviation from the presumptive guideline amount.

Tenn. Comp. R. & Regs. 1240-02-04-.07(1)(c). As the trial court in this action noted, Tennessee Code Annotated 36-5-101(e)(1)(A) provides:

In making the court's determination concerning the amount of support of any minor child or children of the parties, the court shall apply, as a rebuttable presumption, the child support guidelines, as provided in this subsection (e). If the court finds that evidence is sufficient to rebut this presumption, the court shall make a written finding that the application of the child support guidelines would be unjust or inappropriate in that particular case, in order to provide for the best interest of the child or children, or the equity between the parties. Findings that the application of the guidelines would be unjust or inappropriate shall state the amount of support that would have been ordered under the child support guidelines and a justification for the variance from the guidelines.

The trial court's findings as to the parties' respective incomes are undisputed. The court found Father's monthly gross income to be $9,662.17, or $115,946.00 annually, and Mother's monthly gross income to be $1,386.67, or $16,640.00 annually. Mother acknowledged during the first trial that in the previous year, she had started but not completed the financial aid application process for Stella at Baylor, stating that she had believed she would need Father's cooperation to complete the process. Mother also acknowledged that she had received funds in August or September of 2018 from both her accident settlement in the amount of approximately $160,000.00 and the release of a trust fund in the amount of $189,000.00.

However, Mother testified that although she had paid the bulk of Stella's tuition for the first and second years at Baylor, her settlement and trust fund monies had been depleted by the time of trial. Mother stated that she had paid off $23,000.00 in student loans, paid $40,000.00 to purchase a vehicle, and made an $82,000.00 or $83,000.00 down payment on the home she purchased with her current husband on Lookout Mountain. According to Mother, she had also utilized a portion of her settlement proceeds to pay for multiple medical expenses, including surgical procedures, resulting from her accident. Mother testified that in addition to her current husband and the Children, she resided with her husband's two young children for whom he had been awarded sole custody in a divorce judgment from his previous marriage. Mother also testified that her current husband earned approximately $67,000.00 per year.

Although each parent respectively submitted an income and expense statement indicating that he or she operated at a monthly deficit, Father acknowledged at trial that he did have approximately $70,000.00 in total assets. According to Father, he possessed "a little bit lower" than $30,000.00 in a savings account and approximately $5,000.00 in a health savings account. Father acknowledged that with the Modified PPP, the amount he would save on the Children's health care insurance would be $4,968.00 per year and that he had received federal income tax refunds over the previous three years, including

$6,623.00 in 2017 and $9,323.00 in 2018. Father testified that at the time of trial, he resided with his mother in her home on Signal Mountain and had been paying her $850.00 in monthly rent since May of 2019. He paid a monthly automobile payment in the amount of approximately $400.00.

In its March 2020 order, the trial court made the following specific findings of fact, in pertinent part, in support of the upward deviation:

Stella has attended Baylor for almost a year and a half, making friends and "best friends," and developing very well academically . . . as well as athletically and socially. Pulling Stella out of Baylor probably would harm Stella, harm her in maintaining her friends, including losing her best friends, and probably harm her academically. The disruption would possibly harm her psychologically due to guilt or feelings that she is not acceptable or good enough to be at Baylor. The Court credits the testimony that Stella seems to be doing very well for a lot of reasons, and thriving at Baylor, and she had a good routine there, and she enjoys a lot of different extracurricular activities there. The Court also finds that if the parties were still living together, given the family lifestyle and their incomes, they would be able to afford one child at Baylor as long as they were getting 67 percent of the demonstrated-need financial aid. Thus, the application of the guidelines would be against Stella's best interest regarding academics and unjust to her and it would not be equitable given all of the foregoing. In addition, Father will be saving $4,968 per year in not having that amount taken out from his paycheck for health insurance premiums for the health insurance coverage for the three children. Further, the Court finds that Father has received thousands in tax refunds over the years, including approximately a $9,000 tax refund in 2018.

In making its determination, not only has the Court considered all available income, but also finds that the amount of the child support, other than the amount calculated in the guidelines, is reasonable and necessary to provide for the needs of the minor children. The Court finds that the deviation is reasonably necessary to provide for Stella's needs, given she is at Baylor.

Chapter 1240-2-4-.07 paragraph (2)(d) and paragraph (1)(d) address extraordinary educational expenses: Extraordinary educational expenses may be added and include tuition fees and other reasonable room and board, lab fees, etc., and other reasonable and necessary expenses, and private secondary schooling that are appropriate to the parents' financial

abilities and to the lifestyle of the child if the parents and child were living together.

In determining the amount, the Court has considered scholarships, grants, stipends, and other cost-reducing programs received by or on behalf of the child.

A monthly average of these expenses shall be based on evidence of prior or anticipated expenses and entered on the worksheet in the deviation section.

The Court credits Mr. Bill Murdock's testimony that currently the tuition at Baylor per school year is $25,440. The 12-month average is a monthly expense for tuition in the amount of $2,036.66.[8]

The Court finds that Father should pay 60 percent of the tuition that will be due after financial aid for Stella to attend Baylor School. The Court assumes both parties will seek out financial aid. If both parties obtain financial aid, then it would be 60 percent of the amount that remains after financial aid is considered. If a party chooses to obtain financial aid, considering a certain amount will be required to be paid on the front end, that was the first number that Mr. Murdock was giving us like in the example of $5,000, that is then subtracted from the tuition, yielding the "demonstrated need" part, and then Baylor pays on average he said 67 percent of the demonstrated-need amount.

The Court finds that Father should be responsible for only 60 percent of the tuition that will be required after financial aid for Stella to attend Baylor because of Mother's unilateral decision affecting Stella in regards to Baylor School. Instead of 87 percent, which would be the pro rata share, the Court is reducing Father's pro rata share by 27 percent.

The Court finds that Father shall also be responsible for 50 percent of camp fees, up to a cap of $4,000.

The parties will split 50 percent of all other agreed extracurricular activities.

(Paragraph numbering and lettering omitted; emphasis added.)

---

[8] We note a nominal mathematical error in the trial court's order in that one-twelfth of $25,440.00 equals $2,120.00 rather than $2,036.66.

As to financial aid, Mr. Murdock testified during both trials that in the case of divorced parents, each parent's financial aid application would be considered separately and that only one parent would ultimately sign a contract with Baylor to become liable for the tuition. Concerning Stella's Baylor tuition, the trial court stated in its memorandum opinion incorporated into the March 2020 order: "It's up to each party to get financial aid. It's 60 percent for him, 40 percent for her. It would strongly behoove them both to apply for financial aid to bring that real number down that they're percentage-wise responsible for." Father acknowledged during the second trial that he had not submitted a financial aid application to Baylor following the trial court's initial ruling, stating that he believed his participation in the financial aid application would have hurt Stella's chances of receiving financial aid.

Upon review, we determine that the evidence supports the trial court's finding in its March 2020 order that the parties could afford Stella's Baylor tuition with the assistance of partial financial aid. Father acknowledges that the shift in health insurance coverage for the Children afforded him a savings in the amount of $4,968.00 per year. On appeal, he specifically argues that the trial court erred in considering his sizeable federal income tax refunds because the Guidelines provide for calculation of child support based on adjusted gross income. However, we do not find that the trial court calculated Father's income tax refunds as though they were additional income. As Mother points out, the trial court noted that Father had the advantage each year of claiming two of the three Children as dependents, and Father acknowledged during the first trial that the amount of his refunds indicated that he could have arranged to have less withheld from his monthly paychecks and still covered his tax obligation. This evidence contributed to the trial court's finding that Father had the ability to pay a significant percentage toward Stella's Baylor tuition.

However, our analysis cannot stop there because the financial aid considered by the trial court did not materialize. Father argues that given the trial court's finding in the March 2020 order that the parties would have been "able to afford one child at Baylor as long as they were getting 67 percent of the demonstrated-need financial aid," the court's subsequent finding that an upward deviation was still warranted with no financial aid was inconsistent. Following the second trial, during which Mr. Murdock testified that Baylor had not awarded financial aid to Stella or Amy, the trial court *sua sponte* amended its March 2020 order, specifically finding as follows in relevant part:

> There has been a change in circumstances regarding the assumptions about the financial aid available from Baylor School. The assumptions based on the testimony of Bill Murdock were incorrect, and unfortunately neither [Stella] nor [Amy] received any such aid from the Baylor School, as

- 29 -

only 30 applications were awarded for financial aid. Further, there is no reason to find that the outcome would be different if Father had made an application for financial aid. Further, it may have been counterproductive if Father had applied as it could have negatively affected eligibility for financial aid.

Due to such low numbers of applicants receiving financial aid and the fact that taking Stella out of Baylor School would still to this day be harmful to Stella, it is in Stella's best interest to stay at Baylor School.

The division of the responsibility for paying for the Baylor School tuition should be modified however from a 60/40 division to a 50/50 division for tuition only. The camps are not the responsibility of the Father, and the Father does not have to pay for extracurricular activities or books or board or fees or other expenses for Stella at Baylor School.

(Paragraph numbering omitted.)

As the trial court had noted in its March 2020 order, Mr. Murdock testified during the first trial that "typical awards" of financial aid to Baylor students "are right at 67 percent of demonstrated need." He defined "demonstrated need" as "the estimated family contribution subtracted from the tuition." According to Mr. Murdock, the assessment of need-based financial aid included a "meritorious component." Mr. Murdock acknowledged during the second trial, however, that for the upcoming 2020-2021 year, all of Baylor's thirty financial aid awards had been made to returning students who had received financial aid in the past.

The trial court responded to this new evidence by *sua sponte* amending its prior order to reduce Father's portion of Stella's Baylor tuition from sixty percent to fifty percent and by eliminating any requirement for Father to pay camp expenses for the Children or other expenses related to Stella's Baylor attendance or participation in extracurricular activities at Baylor. Mother testified during the second trial that Stella's tuition at Baylor for the upcoming year would be $26,400.00, meaning that Father's fifty-percent responsibility would be $13,200.00 for the 2020-2021 year.[9] As previously ordered, the upward deviation for sixty percent of the tuition with no financial aid would

---

[9] Mr. Murdock testified specifically as to what Amy's upcoming tuition would be for the 2020-2021 academic year, stating that it would be $26,460.00. However, Mother testified to the $26,400.00 amount for Stella and has not questioned that amount on appeal. We note that Father has stated in his appellate brief that the tuition would be $25,440.00. However, that was the tuition amount Mr. Murdock testified to for the 2019-2020 academic year when the 2020-2021 tuition amount had not yet been set by Baylor.

have equaled $15,840.00, meaning that the trial court immediately reduced the upward deviation by $2,640.00 annually upon finding that no financial aid was forthcoming.

Furthermore, Father's previously ordered responsibility for the Children's camp expenses had been capped at $4,000.00, although by the second trial, Mother acknowledged that she no longer thought that either parent should have to pay for camps in the absence of a future agreement. Although testimony was not specific concerning the amount of extracurricular and other expenses at Baylor, Mr. Murdock stated that books and a required technological device, such as an iPad or laptop, were not included in tuition. Under the trial court's amended order concerning Stella, Father is no longer responsible for fifty percent of the cost of those items.

Following our thorough review of the record, we conclude that the trial court did not abuse its discretion in finding that payment of Stella's Baylor tuition, even without financial aid, was appropriate to the parents' financial abilities and to the lifestyle that Stella would have enjoyed if the parents and child were living together. *See* Tenn. Comp. R. & Regs. 1240-2-4-.07(2)(d)(1)(i). The proof demonstrated that Father had sufficient income and assets to contribute fifty percent of one child's tuition at Baylor. Mother, while earning only $16,640.00 annually, had managed to pay the Baylor tuition, with some assistance from Maternal Grandmother, for nearly two years from her accident settlement and trust proceeds, and she possessed some assets, including approximately $80,000.00 in equity in the home she had purchased with her current husband.

We reiterate that a court abuses its discretion only when it "applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *See Richardson*, 189 S.W.3d at 725. Because the trial court's determination regarding this issue was not against logic or sound reasoning and was within the range of acceptable alternatives, we conclude that no abuse of discretion occurred. *See Smith v. Smith*, No. M2000-01094-COA-R3-CV, 2001 WL 459108, at *13 (Tenn. Ct. App. May 2, 2001).

We therefore affirm the trial court's findings as to the upward deviation in Father's child support obligation. However, noting Mr. Murdock's testimony that Baylor's tuition typically increases approximately two percent each year, we do find the need for modification to ensure that the upward deviation does not increase in the future without further court action. We modify the deviation to equal the lesser of (a) $13,200.00 annually or (b) fifty percent of the current annual Baylor tuition for Stella each year after deduction of proceeds from scholarships, grants, stipends, or other cost-reducing programs received by or on behalf of Stella.

### D. Amy's Enrollment in Private School

Father contends that in response to Mother's second modification petition, the trial court erred by granting Mother permission to enroll Amy in private school, albeit with the provision that Father would not be responsible for any portion of Amy's private school tuition. Mother contends that the trial court's decision to allow enrollment of Amy in private school was in Amy's best interest and was not inconsistent with the court's finding that no upward deviation in Father's child support obligation was warranted to assist with Amy's private school attendance. Upon thorough review of the record, we conclude that the trial court did not abuse its discretion in allowing Mother to enroll Amy in private school provided that Father would not be responsible for any portion of the tuition under the parties' current circumstances.

The trial court in its initial March 2020 order, entered in response to Mother's first petition and upon the evidence presented during the November 2019 trial, ordered that neither Amy nor Joseph, who was by then nine years of age, "may be enrolled or financially committed in any way to a private school without agreement of the parties informally or by mediation or the Court orders it," noting that absent agreement through mediation, "[a]ny remaining dispute . . . must come before the Court for a decision." Mother then filed her second petition concerning Amy in December 2019. Although she subsequently submitted Amy's admittance application and included Amy in her financial aid application for Baylor, Mother did not enroll or financially commit Amy to Baylor.

During the March 2020 trial on Mother's second petition, Mother presented testimony and exhibits demonstrating that approximately one week prior to trial, Amy had received an acceptance letter from Baylor. Mother testified that she had completed the Baylor application process, which necessarily involved Amy's participation in an interview at Baylor, and the financial aid application process without Father's assistance. Mother also testified that she had regularly informed Father, usually via text message, of Amy's progress in the application process and that she had requested that Father complete a financial aid application. In testifying that neither Stella nor Amy received a financial aid award from Baylor for the upcoming year, Mr. Murdock stated that Mother's single financial aid application was considered for both Stella and Amy.

Mother testified during the second trial that she had also completed admittance and financial aid applications for Amy at Chattanooga Christian School ("CCS"). She stated that Amy had been accepted at CCS also and that Amy had been granted $2,000.00 in financial aid toward CCS's $12,000.00 tuition cost. Mother also testified that because of Amy's high academic performance and athletic ability, Mother believed it would be in Amy's best interest to attend Baylor.

The trial court dismissed Mother's second modification petition concerning Amy in its April 2020 order specifically addressing the petition. However, the court included the following provision:

> The parties may agree to use [Father's] residence as the "PRP" [primary residential parent's residence] for school zoning purposes. However, in the alternative, [Mother] may enroll [Amy] at Baylor School, Chattanooga Christian School, or a public school, but [Father] is not obligated for the Baylor School or Chattanooga Christian School tuition for [Amy] under the current circumstances.

At the close of the second trial, the following exchange occurred:

Mother's Counsel:    [C]an we not enroll Amy at Baylor or Chattanooga Christian without asking any financial responsibility from [Father] whatsoever?

Trial Court:    Objection?

Father's Counsel:    Is that in perpetuity? I mean, as we know, child support is subject to modification, and if I say to my client, oh, go ahead and let her enroll this year, then he's open for the next six years to petitions for modification.

Mother's Counsel:    I think we'll always probably be this way, but he may win the Lottery. I mean, I can't say until twelfth grade.

Trial Court:    Sure, you can do that, but to get him to pay, you would have to file something. See what I'm saying?

Mother's Counsel:    I understand.

Trial Court:    In the future.

Mother's Counsel:    In the future. He has to pay nothing other than what you talked about with Stella.

Trial Court:    That's right.

Mother's Counsel:    And he has to pay nothing toward Amy.  Predictable, he will not pay anything toward Joseph.

Trial Court:    Right.

Mother's Counsel:    I know you're not ruling, you're telling us a roadmap, but if she doesn't get any money from him other than the basic child support, she can enroll Amy at Baylor?

Trial Court:    Yes.

Father's Counsel:    Your Honor, I would like the Order to reflect that that is over his objection.

Trial Court:    Over his objection?

Father's Counsel:    Yes, sir.

Trial Court:    A free Baylor tuition?

Father's Counsel:    Your Honor –

Trial Court:    Oh, I need to hear some more of this.

Father's Counsel:    Free for this year.  She just stated that they would sue him for more child support.

Mother's Counsel:    I didn't say we would sue him for more child support. I said if he won the Lottery I might come back.

Trial Court:    What's your objection to a free Baylor education?

Father's Counsel:    I have no objection for the current time, Your Honor, but this child is in the sixth grade.  She has six years of Baylor.  It opens my client up to the potential to be sued for tuition down the road.  That is my objection.

Trial Court:    Well, I can't stop people from suing.

Father's Counsel:    Well, if the child isn't enrolled there, then he's not going to be sued for more tuition.

| | |
|---|---|
| Mother's Counsel: | I tell you what, I just got permission from my client that for the next three years she won't sue him no matter whether he wins the Lottery or not. We just can't say with her health condition that we won't do – |
| Trial Court: | Okay. |
| Mother's Counsel: | But three years, and I got her permission. |
| Trial Court: | Object to that. |
| Father's Counsel: | I haven't had a chance to talk to my client, Your Honor. I mean, I don't know what he wants me to do. What about Joseph, does this impact Joseph at all, Your Honor? |
| Trial Court: | I'm not making any future rulings. You agree to what you want to. If you're going to give up a free Baylor tuition, that's your job. |

On appeal, Father points out that this exchange was never incorporated into the trial court's order and that Mother's "agreement" during the exchange that she would not petition for a child support modification to require Father to contribute to Amy's private school tuition was not memorialized. We agree with Father on this point. The trial court did decline to make any "future rulings" regarding hypothetical changes in circumstance that may occur in the future.

However, the trial court was clear in its order dismissing Mother's second petition that Father, given the current financial circumstances of the parties, would be under no obligation to contribute to a private school education for Amy as an upward deviation in his child support obligation. Specifically, the court stated:

> There is insufficient reason to deviate from the child support guidelines for extraordinary expenses for [Amy] given the current financial circumstances of the parties and also based on the fact that Baylor School gave only 30 awards for financial aid, and did not give any award for [Amy], and the Chattanooga Christian School did not award a significant amount of financial aid toward tuition, at least not significant enough to justify a deviation under the child support guidelines.

Mother has not contested this finding.

On appeal, Father posits that allowing Mother to enroll Amy in a private school is not in Amy's best interest because "the financial realities of the parties' situation lead to the inevitable conclusion of the children having to leave school which arguably will result in more disruption than if the court had ordered no further private school." Father also argues: "Undoubtedly when [Mother] sues [Father] for modification again she will argue the child is already enrolled and doing well just as she did with the first child." Father's argument in this regard seeks to have the trial court do what it found it could not at the close of the second trial: make a ruling on a hypothetical future petition. The trial court dismissed Mother's petition to modify the parties' permanent parenting plan to require Father to pay any portion of private school tuition for Amy. The trial court's grant of permission to Mother to enroll Amy in either Baylor or CCS if she found the means to do so financially did not require any financial contribution from Father.

Throughout the proceedings, Father's objections to private school have been primarily economic. He does not dispute Mother's testimony that Amy has demonstrated academic and athletic aptitude that would serve her well in private school. With the economic demand upon Father removed, his expressed concern is that Amy may become attached to Baylor or CCS and then suffer disruption if she has to leave the school. Although we find this a valid concern in the event that Mother does enroll Amy in a private school at her own expense, we cannot find that the trial court abused its discretion by allowing Mother to enroll Amy at Baylor or CCS provided that she manages to shoulder one-hundred percent of the financial burden associated with doing so. *See Smith*, 2001 WL 459108, at *13 ("While we will set aside a discretionary decision if it rests on an inadequate evidentiary foundation or if it is contrary to the governing law, we will not substitute our judgment for that of the trial court merely because we might have chosen another alternative." (quoting *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000))).

## V. Attorney's Fees on Appeal

Father asserts that because he prevailed in obtaining the dismissal of Mother's second modification petition and because Stella and purportedly Amy were enrolled at Baylor over his objection, he is entitled to reasonable attorney's fees on appeal. Father relies on Tennessee Code Annotated § 36-5-103(c), which in the version applicable to this consolidated action provided:[10]

---

[10] Effective July 1, 2018, subsequent to the filing of Mother's initial modification petition in April 2018, the General Assembly amended Tennessee Code Annotated § 36-5-103(c) to delete the subsection and substitute the following:

The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

As this Court has explained:

A spouse who defends a petition to change an alimony or child support order is acting to enforce it. The statute does not distinguish between winners and losers, and while the courts have sometimes made that a factor, see *Placencia v. Placencia,* 3 S.W.3d 497 (Tenn. Ct. App. 1999), we do not think it is the determining factor. In each case the court should do what is equitable. *See Sherrod v. Wix,* 849 S.W.2d 780 (Tenn. Ct. App. 1992).

*Duke v. Duke*, No. M2001-00080-COA-R3-CV, 2003 WL 113401, at *5 (Tenn. Ct. App. Jan. 14, 2003).

Awards of attorney's fees on appeal are within this Court's discretion pursuant to Tennessee Code Annotated § 36-5-103(c). *See Pippin v. Pippin*, 277 S.W.3d 398, 407 (Tenn. Ct. App. 2008). In our discretion and considering the equities involved in the parties' respective financial situations, as well as Father's overall lack of success on appeal, we deny Father's request for attorney's fees on appeal.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgments, including its finding that an upward deviation in Father's child support obligation was warranted to fund a portion of Stella's tuition expenses at Baylor. However, we modify this deviation

A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the non-prevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

*See* Tenn. Pub. Acts, Ch. 905, § 1 (H.B. 2526).

to equal the lesser of (a) $13,200.00 annually or (b) fifty percent of the current annual Baylor tuition for Stella each year after deduction of proceeds from scholarships, grants, stipends, or other cost-reducing programs received by or on behalf of Stella. The trial court's final judgments, inclusive of the Modified PPP, are otherwise affirmed in all respects. Father's request for an award of attorney's fees on appeal is denied. We remand this case for enforcement of the judgments and collection of costs below. Costs on appeal are taxed to the appellant, James Michael Bastone.

s/ Thomas R. Frierson, II_____

THOMAS R. FRIERSON, II, JUDGE